# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 17-24567-Civ-SCOLA/TORRES

CRAIG SALVANI,

    Plaintiff,

v.

CORIZON HEALTH, INC. *et al.*,

    Defendants.

_____/

## ORDER ON DEFENDANTS' *DAUBERT* MOTION

This matter is before the Court on Wexford Health Sources, Inc.'s ("Wexford") and Marta Castillo's ("Ms. Castillo") (collectively, "Defendants") *Daubert* motion to exclude the testimony of Craig Salvani's ("Plaintiff") experts, Dr. Chertoff and Dr. Kern. [D.E. 118]. Plaintiff responded to Defendants' motion on August 15, 2019 [D.E. 138] to which Defendants replied on August 22, 2019. [D.E. 145]. Therefore, Defendants' motion is now ripe for disposition. After careful consideration of the motion, response, reply, relevant authority, and for the reasons discussed below, Defendants' motion is **DENIED**.[1]

### *I. BACKGROUND*

Plaintiff is a former inmate at the Florida Department of Corrections ("FDOC") who filed this action on December 18, 2017 for a violation of his civil rights. [D.E. 1]. Plaintiff entered the custody of the FDOC at the South Florida

---

[1] On August 2, 2019, the Honorable Robert N. Scola referred Defendants' *Daubert* motion to the undersigned Magistrate Judge for disposition. [D.E. 122].

1

Reception Center on February 6, 2014. Employees of Wexford Health Sources, Inc. ("Wexford") provided medical services at the prison. On February 12, 2014, a urinalysis indicated that Plaintiff had an infection. A nurse ordered an x-ray and another urinalysis was scheduled in seven days. The x-ray allegedly included a granuloma in Plaintiff's left lung and another x-ray was recommended. Plaintiff claims, however, that the follow-up x-ray was never performed and that five days later a nurse noticed that Plaintiff had an increased heart rate.

On February 20, 2014, prison officials transferred Plaintiff to the Regional Medical Center – a hospital that FDOC owns and where Corizon Health, Inc. ("Corizon") provides medical services. Plaintiff alleges that he complained to medical personnel during the next several days. At 1:14 a.m. on February 24, 2014, Plaintiff claims that he suffered from hyperventilation and low blood pressure. Plaintiff then alleges that Jorge Caraballo ("Dr. Caraballo") examined him at 4:20 a.m. and that Dr. Caraballo ordered an IV and laboratory testing. Plaintiff was transferred to an outside hospital later that morning and he was diagnosed with sepsis, pneumonia, and endocarditis. Approximately two weeks later, Plaintiff's legs were amputated. Plaintiff alleges that he was injured because Corizon has a policy of saving money at the expense of delivering quality medical care. Plaintiff also claims that Dr. Caraballo could not treat him immediately because Dr. Caraballo was required to get permission before he could send Plaintiff to the hospital. Because Corizon failed to deliver quality healthcare and attempted to

save money at the cost of Plaintiff's well-being, Plaintiff concludes that Corizon violated his civil rights.

## II. APPLICABLE PRINCIPLES AND LAW

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702.[2] The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

---

[2] Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

3

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as "gatekeeper," its duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and while they "remain distinct concepts"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique;

4

and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing

5

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

### III. ANALYSIS

Defendants' motion seeks to exclude the following evidence: (1) Dr. Chertoff's opinion that prisoners with sepsis have a higher mortality and rate than non-prisoners with sepsis, (2) Dr. Chertoff's and Dr. Kern's opinion that Wexford was deliberately indifferent in failing to have a custom, policy, or practice to provide necessary medical care, and (3) Dr. Kern's opinion on causation. Plaintiff opposes Defendants' motion because it is conclusory, ignores the record presented, and misstates the testimony expected at trial. We will discuss the arguments presented in turn.

We begin with Defendants' challenge to Dr. Chertoff's opinion that prisoners with sepsis have a higher mortality rate than non-prisoners with sepsis:

> The suboptimal outcome that Mr. Salvani and other prisoners experience from sepsis is unfortunately not uncommon and has been documented in the medical literature. In fact, a retrospective study of 8,568 patients treated for sepsis at the University of Florida, using data from October 1, 2013, to November 30, 2016, showed that the risk of death among prisoners with sepsis was 2.8 times that of nonprisoners. Although these results should be confirmed in larger case-control studies, the researchers speculated that their study

6

suggests a direct association between incarceration and sepsis morbidity and mortality.

[D.E. 118] (internal citations omitted). Defendants take issue with Dr. Chertoff's opinion because it relies on a prior article that Dr. Chertoff authored and therefore fails meet any of the three *Daubert* requirements. That is, Defendants contend that Dr. Chertoff is unqualified, that his opinion is unreliable, and that he will be unhelpful to the jury. For these reasons, Defendants conclude that Dr. Chertoff's opinion as it relates to the mortality rate of prisoners vis-à-vis non-prisoners must be excluded.

Defendants' argument is entirely unpersuasive because it contains *no* substantive reasons as to why Dr. Chertoff's opinion should be excluded.[3] Defendants merely claim that Dr. Chertoff is unqualified, unreliable, and unhelpful and then Defendants summarily conclude that he violates *Daubert*. Defendants provide no other reasons in support of their position. Instead, Defendants leave it to the Court to determine if Defendants' arguments have merit, but we have no duty to do the work that Defendants should have done in the first place. *See, e.g., Gottstein v. Flying J, Inc.*, 2001 WL 36102297, at *1 (N.D. Ala. Aug. 22, 2001) ("The burden is on the moving party to demonstrate a 'threshold level of unreliability in

---

[3] Even if we considered Defendants' argument on the merits, the disposition of Dr. Chertoff's opinion and testimony would remain the same. Dr. Chertoff is a licensed physician to practice medicine in New York, Ohio, and Florida with specialties in pulmonary, critical care, and internal medicine. He is also a board-certified diplomat and his opinion is tied to his work in the medical and surgical care units of sepsis patients. While Dr. Chertoff references his prior work on the mortality rate of sepsis patients, that alone does not lead to a conclusion that he is unqualified, unreliable, or unhelpful. Therefore, there is nothing in the record to show that Dr. Chertoff's opinion on sepsis patients violates *Daubert*.

7

order to 'trigger' the [Court's *Daubert*] gatekeeping obligation.'") (citation omitted). Defendants' motion is also completely devoid of any legal authority or references to undermine Dr. Chertoff's opinions. Accordingly, Defendants' motion to exclude Dr. Chertoff's opinion as to the mortality rate of prisoners with sepsis is **DENIED** because it is conclusory and fails to provide any reasons in support thereof.

Defendants' next argument is that Dr. Chertoff and Dr. Kern should be excluded from offering any opinion or testimony on whether Wexford was deliberately indifferent in failing to have a custom, policy, or practice to provide necessary medical care. While the doctors were not asked to opine on Wexford's indifference and their expert reports are mute on the matter, Defendants speculate that Plaintiff will attempt to question these doctors on these issues at trial. As such, Defendants request that the Court preclude any testimony on this topic as it relates to Plaintiff's experts.

Defendants miss the mark because, as Plaintiff states in his response, Plaintiff does not intend to use either doctor to opine on whether Wexford was deliberately indifferent. Plaintiff posits, for example, that there is "[n]o statement of such intention . . . in the record," and that Plaintiff does not intend to rely on either doctor to opine on Wexford's custom or practices. [D.E. 138]. Because Plaintiff represents that neither doctor will offer any testimony or evidence on whether Wexford was deliberately indifferent with respect to its policies, Defendants' motion is **DENIED as moot**.

8

The final issue is whether Dr. Kern should be permitted to testify on causation. Defendants argue that Plaintiff intends to introduce evidence that "because of . . . substandard care, [the] infection in Mr. Salvani was allowed to progress to sepsis with subsequent severe complications including cardiac arrest and amputation." [D.E. 118-3 at 6]. Defendants claim that Dr. Kern lacks sufficient facts to make this opinion and that, pursuant to Rule 702, Dr. Kern's opinion should be excluded.

Aside from being conclusory, Defendants' argument is unpersuasive because there are a plethora of facts and data to support Dr. Kern's conclusion that substandard care was, in part, the cause of Plaintiff's complications. Dr. Kern reviewed, for instance, the medical records of Wexford's healthcare providers, the underlying laboratory reports, Plaintiff's vital signs, blood tests, x-rays, and other physical examinations.

Based on these records, Dr. Kern opined that Plaintiff had several abnormal findings in his medical record – including a lung lesion, elevated white blood cell count, and low platelets – and that even a lay person would have recognized that a patient with Plaintiff's ailments needed medical attention. Dr. Kern then opined that, if healthcare providers had noticed the abnormalities, quick action could have been taken to avoid a more serious underlying condition. Given the voluminous data that Dr. Kern relied upon for his opinion, there is an abundance of support for his conclusion that substandard care was, in part, a cause of Plaintiff's injuries.

9

Accordingly, Defendants' *Daubert* motion to exclude Dr. Kern because he failed to rely on sufficient facts or data is **DENIED**.

## *IV. CONCLUSION*

For the foregoing reasons, Defendants' *Daubert* motion [D.E. 118] to exclude the testimony and opinions of Dr. Chertoff and Dr. Kern is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of August, 2019.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge