United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Craig Salvani, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 17-24567-Civ-Scola |
| Corizon Health, Inc., and others, | ) |
| Defendants. | ) |
| | ) |

**Order on the Motions for Summary Judgment**

This action arises from the medical treatment the plaintiff, Craig Salvani, received while he was an inmate in the custody of the Florida Department of Corrections. Salvani brings 28 U.S.C. § 1983 claims against certain prison medical care providers whose alleged deliberate indifference to his Eighth Amendment rights resulted in the amputation of his legs. Specifically, Salvani sues Corizon Health, Inc. ("Corizon"), Dr. Josue Jorge Caraballo, a physician employed by Corizon, Stephanie G. Loznicka, a nurse employed by Corizon, Wexford Health Sources, Inc. ("Wexford"), and Dr. Marta Castillo, a physician employed by Wexford.[1]

Now before the Court are three motions for summary judgment: Dr. Castillo's motion (ECF No. 117), Wexford's motion (ECF No. 116), and Corizon, Dr. Caraballo, and Loznicka's motion (ECF No. 110). After reviewing the parties' written submissions and exhibits, and the applicable law, the Court **grants** Dr. Castillo's motion (**ECF No. 117**), **grants** Wexford's motion (**ECF No. 116**), and **grants in part and denies in part** Dr. Caraballo, Loznicka, and Corizon's motion (**ECF No. 111**). Summary judgment is **granted** as to Corizon, and **denied** as to Dr. Caraballo and Loznicka.

1. **Background**

Craig Salvani was an inmate in the custody of the Florida Department of Corrections ("FDOC") when he received the medical care giving rise to this suit. (ECF No. 110 at ¶ 1.) He entered into FDOC custody on February 6, 2014. Previously, he was incarcerated in the Lee County Jail from January 21, 2014 to February 6, 2014. During his detention in the Lee County jail, he was involved in an altercation with other inmates that injured his elbow and neck. *Id.*

---

[1] Esther Mathurin, a nurse employed by Wexford, was dismissed from the case in Salvani's stipulation for dismissal. (ECF No. 84.)

The South Florida Reception Center conducted Salvani's initial intake screening, where Wexford provided medical services to inmates. (ECF No. 91 ¶¶4-6.) During his intake screening, Salvani disclosed that he was injured in the jail during a fight. (ECF No. 110 at ¶ 2.) Wexford took blood and urine tests, whose results were available on February 8, 2014. (*Id.* at ¶ 9.) The blood and urine test results showed several abnormalities including high white blood cell count and the presence of small amounts of blood in his urine. (ECF No. 91 at ¶¶10-11.)

On February 8, 2014, Salvani again complained of neck and back pain, and was seen by a Wexford nurse. He had a fever of 100.00 degrees but did not have the "abnormal vital signs that would trigger further action." (ECF No. 91 at ¶ 12.) A temperature greater than 100.4 degrees would have required the doctor to be notified. (ECF No. 137 at ¶ 12.) He was given ibuprofen for his neck pain. (ECF No. 91 at ¶ 12.) Four days later, on February 12, 2014, a Wexford nurse conducted his initial medical exam. (*Id.* at ¶ 12.) Salvani's vital signs, his temperature, pulse, blood pressure, and respirations, appeared within the normal range. (ECF No. 91 at ¶ 14.) The nurse reviewed the blood and urine results collected on February 6, 2014, and she ordered ibuprofen, flu vaccine, a cervical spine x-ray, a repeat urine and blood test to be conducted in four weeks, and a low bunk pass. (*Id.* at ¶¶ 16-17.) The cervical spine x-ray was completed on that day. (*Id.* at ¶ 18.) On February 13, 2014, the radiologist noted that "[i]ncidentally noted nodule in the left upper lobe…Please follow up with chest radiographs." (*Id.* at ¶ 19.) There is no indication in the record that follow up chest radiographs were scheduled.

Four additional days later, on February 17, 2014, Salvani was evaluated by another Wexford nurse due to his complaint that he "started coughing green mucus since Friday. [His] chest hurt when coughing. [He] feel[s] freezing." (*Id.* at ¶¶ 20-21.) The nurse found that he had an elevated pulse at 120. *Id.* Salvani alleges that he also complained that was "getting really sick," and that he had night sweats and was dehydrated. (ECF No. 137 at 21.) The medical staff also noted the elevated white blood cell count and the abnormal urinalysis from February 6, 2014. (*Id.* at ¶ 22.) The nurse notified Dr. Castillo of all of Salvani's symptoms at 2:20 on February 17, 2014, which was required because he had a pulse higher than 110. (ECF No. 91 at ¶ 23.) The Wexford nurse gave Salvani ibuprofen and cough syrup. (*Id.* at ¶¶ 24-25.) Wexford claims that he was instructed to return if symptoms worsened. (*Id.*) Later that same day, Dr. Castillo ordered a repeat urinalysis and an EKG. (*Id.* at ¶ 27.) The results of the urinalysis were reported on February 18, 2019, which showed abnormal indicators similar to the previous urinalysis. (*Id.* at ¶ 28.) Salvani alleges the EKG also showed he

had an abnormally high heartrate. (ECF Nos. 137 at ¶ 28, 90-1 at 31.) Dr. Castillo never examined Salvani. (ECF No. 91 at ¶¶ 30-31.)

On February 20, 2014, Salvani was moved from the South Florida Reception Center to the Reception and Medical Center in Lake Butler, Florida. (ECF No. 110 at ¶ 6.) Loznicka conducted Salvani's intake process. (ECF No. 134 at ¶ 9.) Loznicka and Salvani have different versions of the events that occurred at intake. On the one hand, Loznicka claims that the transfer summary only indicated he was being treated for neck pain and dental problems. (ECF No. 110 at ¶ 9.) Although she did not take his temperature, all other vital signs were within normal limits. Salvani did not complain, and she did not think that a physician's care was necessary. (*Id.*) According to Loznicka, she told Salvani he could use a "sick call" or "declare a medical emergency" if necessary. (*Id.*) On the other hand, Salvani claims that he was visibly very ill. (ECF No. 134 at ¶ 9.) He told "anyone who would listen" that he had medical issues. (*Id.*) He alleges that he requested medical care at intake, stating that he was "really sick" and that he was "supposed to see a doctor," but was threatened by unnamed individuals with confinement. (*Id.* at ¶ 8.) Salvani claims that Loznicka reviewed his medical file containing his previous blood and urinalysis reports, the EKG, and the x-ray, all containing abnormal results. (*Id.* at ¶ 9.) Despite his complaints, his appearance, and his medical reports, Loznicka merely stamped his transfer paperwork without providing any treatment or requesting follow up examinations. (*Id.*)

Corizon alleges that Salvani did not make any medical complaints between his arrival and February 24, 2014 at 1:14 a.m. (*Id.* at ¶ 11.) Salvani alleges that he complained during his intake and to a correctional officer. (ECF No. 134 at ¶11.) His complaints were ignored. (*Id.*) At 1:14 a.m. on February 24, 2014, he was taken to the West Unit and seen by nurses who were unable to start an I.V. (ECF No. 110 at ¶ 11.) He exhibited shortness of breath and was barely able to speak. (*Id.*) Salvani claims that Dr. Caraballo was notified that Salvani was in critical condition at 1:14 a.m. (ECF No. 134 at ¶ 11.) Corizon alleges that Dr. Caraballo was notified at 2:30 a.m., and he ordered Salvani to be brought to him for examination at that time. (*Id.*) The nurses told Dr. Caraballo that "Mr. Salvani has low blood pressure" and that "he was incoherent," but he does not remember whether any other details were disclosed over the phone. (ECF No. 131-3 at 42.) He did not immediately send Salvani directly to the hospital or otherwise provide treatment. *Id.* Salvani was transported to the Main Unit, and he did not arrive until 4:20 a.m. (ECF No. 110 ¶ 12.) According to Corizon, "[n]o one involved in this case knows why this [delay] happened, and Dr. Caraballo remembers no other time there was this type of delay by corrections officers." (*Id.*)

Dr. Caraballo evaluated Salvani at 4:20 a.m. (*Id.* at ¶ 13.) He found that Salvani had low blood pressure and increased heart rate. (ECF No. 110 at ¶ 13.)

He ordered vancomycin and Levaquin because he suspected that Salvani may have sepsis. He also ordered an x-ray, oxygen and blood tests. (*Id.*) He contacted Memorial Hospital-Jacksonville to alert them that he was sending Salvani there. (*Id.*) Memorial Hospital is much farther away than Shands Teaching Hospital, so the EMS personnel took him to Shands instead. (ECF No. 134 at ¶ 13.) The nursing staff failed to carry out Dr. Caraballo's medication order, and Salvani never received any medicine from Dr. Caraballo, Corizon, or any Corizon staff. (ECF No. 110 at ¶ 14.) At 4:55 a.m., Dr. Caraballo ordered Salvani to be sent to the hospital. (*Id.* at ¶ 13.) The nursing staff contacted FDOC staff, and FDOC staff contacted EMS. EMS crew was notified of Salvani's emergency at 5:29 a.m. The crew arrived at 6:01 a.m. and left the prison at 6:15 a.m. Salvani did not arrive at Shands hospital until 6:44 a.m. (*Id.* at ¶ 15.)

At the hospital, the Plaintiff was diagnosed with a heart valve infection and a septic infection. (*Id.* at ¶ 16.) As a result of the sepsis, the Plaintiff's legs had to be amputated. (*Id.* at ¶ 17.)

Additionally, Salvani sets forth facts regarding the practices of Wexford and Corizon. The Florida Correctional Medical Authority's 2015 audit of Corizon's health care made several negative findings including that in 4 of 15 chronic illness clinic records baseline information was incomplete or missing and that 3 of 15 endocrine clinic records demonstrated that abnormal labs were not addressed timely. (ECF No. 134 at ¶ 2.) In a November 2017 assessment of the South Florida Reception Center, Wexford was cited for several inadequate practices. (ECF No. 136-2.) Dr. Carl Meier, the Corizon-employed medical director of the RMC Hospital from 2014 to 2015, testified that he believed Corizon and Wexford were "not providing direct acting antivirals to inmates with hepatitis C solely to save money" and that it was "not providing hernia surgeries to inmates with painful hernias in order to save money." (*Id.* at ¶ 7.)

## 2. Legal Standard

"Summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir. 1986); *see also Brunswick Corp. v. Vineberg,* 370 F.2d 605, 612 (5th Cir. 1967) ("[C]ourts must be mindful of [the] aims and targets [of summary judgment] and beware of overkill in its use."). Thus, summary judgment is only proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. An issue of fact is "material" if it "might affect the

outcome of the suit under the governing law." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal citation omitted). "A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal citation and quotations omitted).

The moving party bears the burden of proof to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990); *see also Tippens v. Celotex Corp.*, 805 F.2d at 952 ("The District Court . . . can only grant summary judgment if *everything* in the record demonstrates that no genuine issue of material fact exists.") (internal citation, quotations, and ellipses omitted). The Court will not weigh the evidence or make findings of fact. *Id.* at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

### 3. Discussion

Salvani asserts Eighth Amendment claims, alleging that the defendants were deliberately indifferent to his serious medical need because his untreated infection led to the amputation of his legs. The defendants now move for summary judgment primarily arguing that the individual defendants were not deliberately indifferent to Salvani's medical needs and that Corizon and Wexford did not have policies or practices that caused Salvani's injuries. The Court addresses each of the defendants' arguments in turn.

"It is well settled that the deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). "To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). "To establish deliberate indifference, the defendant must: (1) have subjective knowledge of a risk of serious harm; (2) disregard the risk; and (3) display conduct beyond mere negligence." *Shaw v. Allen*, 701 F. App'x 891, 893 (11th Cir. 2017) (citation omitted). Thus, a plaintiff must show "that the

defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and actually disregarded that risk." *Id.* Deliberate indifference can include failing to provide medical treatment or delays in providing medical treatment, "though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

### A. Dr. Castillo is entitled to summary judgment because Salvani did not present a serious medical need.

Castillo argues that Mr. Salvani did not present with a serious medical need while at the South Florida Reception Center, where Dr. Castillo was employed as a doctor. (ECF No. 117 at 4.) The Court agrees, and therefore **grants** Dr. Castillo's motion for summary judgment (**ECF No. 117**).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment of one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). "In either of these situations, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* Salvani saw medical professionals several times while incarcerated at the South Florida Reception Center, but they did not diagnose him with an infection. Moreover his infection was not "so obvious that even a lay person would easily recognize the necessity for a doctor's attention" until after he was transferred on February 20, 2014.

Before February 17, 2014, Salvani saw nurses several times, but Salvani did not complain that he felt ill during these visits. He only complained that he had neck pain from a prior altercation. On February 8 and February 12, Salvani received ibuprofen from the nurses to treat his neck pain. Throughout his incarceration, Salvani took several blood and urine tests. Although the results were "abnormal" and it "could be an infection," there was no clear diagnosis. The results presented a "borderline" case rather than an acute emergency. (ECF No. 131-4 at 18-19.)

On February 17, 2014, three days before he was transferred out of the South Florida Reception Center, Salvani first complained that he was feeling ill. Specifically, he complained that he "started coughing green mucus since Friday," that his "chest hurt when coughing," and that he "feels freezing." (ECF NO. 137 at ¶¶ 20-21.) He had an elevated pulse at 120. (*Id.*) At this point, the nurse notified Dr. Castillo of Salvani's symptoms, including the abnormal urinalysis and blood test results. Salvani was provided treatment for his cough, and Dr. Castillo ordered a follow up urinalysis and EKG. At this time, Salvani was

undiagnosed, and there was no serious medical need that any lay person would easily recognize. Salvani was transferred two days later, on February 20, 2014, before Dr. Castillo could have been deliberately indifferent.

Salvani relies on *Milton v. Turner* in arguing that failing to treat an infection is deliberate indifference to a serious medical need. 445 Fed. App'x 159, 164 (11th Cir. 2011). The comparison is inapposite because Milton's injury was obvious to any lay person. Milton's infected hallux had swollen with pus to the point that he could barely walk on it, and the skin on his inner thighs had scraped off. *Id.* He was screaming and declaring that he was in intense pain. *Id.* Here, the medical professionals were uncertain whether he had an infection, the flu, or some other ailment. They proscribed him cough syrup and ibuprofen to treat his symptoms. Moreover, a lay person would not easily recognize that medical attention was needed because he did not have an obvious ailment. Even if Dr. Castillo is guilty of negligence, her actions do not rise to the level of deliberate indifference to a serious medical need. *See Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Mere medical malpractice, however, does not constitute deliberate indifference[, n]or does a simple difference in medical opinion."); *Leonard v. Dep't of Corrs. Fla.*, 232 F. App'x 892, 894 (11th Cir. 2007) (A defendant's response must be "poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law.").

### B. Accepting Salvani's factual account, a jury is entitled find that Loznicka acted with deliberate indifference to Salvani's serious medical need.

A jury believing Salvani's account over Loznicka's account of his intake procedure would be entitled to find that she was deliberately indifferent to Salvani's serious medical need. It is undisputed that nurse Loznicka conducted Salvani's intake procedure when he arrived at the Reception and Medical Center in Lake Butler, Florida on Feburary 20, 2019. The rest of the two accounts are very different and contain many disputes of fact. Thus, the Court **denies** the defendants' motion for summary judgment (**ECF No. 111**) **with respect to Loznicka**.

As stated above, a plaintiff alleging deliberate indifference must show (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." There are significant disputes of fact regarding elements (1) and (2). A medical need is serious if it is diagnosed or "obvious to a lay person that medical attention is needed." Salvani's account supports that his medical need was serious because

it was obvious. Moreover, his account supports his allegation that she was deliberately indifferent because she was subjectively aware of his serious need and she disregarded the risks by failing to schedule a follow up appointment or administer treatment. Salvani says that during at his intake, he was visibly ill. He requested medical care at intake, stating that he "was really sick" and that he "was supposed to see a doctor," "but was threatened with confinement." (ECF Nos. 134 at ¶ 8; 131-7 at 15.) Loznicka reviewed his medical records containing reports of his numerous complaints, the blood and urinalysis reports, the EKG, and the x-ray—all containing abnormal results. (*Id.*) Despite his complaints, his appearance, and the atypical contents of his medical file, Loznicka stamped his transfer paperwork without providing any treatment or requesting a follow up examination. (*Id.* at ¶ 9.) These delays in providing necessary diagnostic care or medical treatment for non-medical reasons may be sufficient for a jury to find that Loznicka violated Salvani's Eighth Amendment rights. *See Fischer v. Federal Bureau of Prisons*, 349 Fed. App'x 372, 374 (11th Cir. 2009) (delay in providing diagnostic care can constitute deliberate indifference); *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (genuine dispute of material fact regarding whether physician and nurse were deliberately indifferent to a serious medical need for further diagnosis due to repeated complaints of severe stomach pain).

On the other hand, Loznicka says that the transfer summary only indicated he was being treated for neck pain and dental problems. (ECF No. 110 at ¶ 8.) All of his vital signs were normal. Salvani did not complain or disclose any previous medical issue to her. (*Id.* at ¶ 9.) She did not think that a physician's care was necessary, and she told Salvani he could use a sick call or declare a medical emergency if he needed care. (*Id.*) The two accounts present a number of factual material questions and credibility determinations that are appropriate for resolution by the finder of fact. If the jury accepts Salvani's version, it could find that Loznicka acted with deliberate indifference to his severe medical need.

### C. There is sufficient evidence for a jury to decide that Dr. Caraballo acted with deliberate indifference.

Salvani has cited sufficient evidence to avoid summary judgment with regards to Dr. Caraballo. Therefore, the Court **denies** the defendants' motion for summary judgment (**ECF No. 111**) **with respect to Dr. Caraballo**.

There are material disputes of fact regarding whether Dr. Caraballo acted with deliberate indifference to Salvani's medical need. Dr. Caraballo was alerted at either 1:14 a.m. (according to Salvani) or 2:30 a.m. (according to Dr. Caraballo) that Salvani had been examined by the nurses, that he was short of breath and unable to speak clearly, and that he had low blood pressure. (ECF No. 131-3 at 40.) Rather than order him to be immediately rushed to the hospital, he

requested that Salvani be transferred to the main unit, so that he could examine Salvani. Due to a series of delays, Salvani did not leave for the hospital until 6:15 a.m. (ECF No. 110 at ¶ 15.) A jury could find that Dr. Caraballo was deliberately indifferent to Salvani's need based on this four-or-five-hour delay. "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003).

It is undisputed that the nature of Salvani's medical need was very urgent by the time that Dr. Caraballo was notified. Dr. Caraballo acknowledges that septic shock needs to be addressed "as soon as possible." (ECF No. 131-3 at 49.) Exactly what Dr. Caraballo was told over the phone by the nurses and how aware he was of the severity Salvani's condition is unclear because Dr. Caraballo says he has no independent recollection of these events and is relying only on medical records. (ECF No. 131-3 at 18.) He testified that he was told "Mr. Salvani has low blood pressure" and that "he was incoherent." (ECF No. 131-3 at 40.) But he does not remember if he was told anything else about Salvani's condition. (*Id.* at 41.) Based on the facts in the record, the jury could conclude that Dr. Caraballo had a subjective awareness of Salvani's urgent need for medical attention.

"[A] defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Id.* There is no record evidence that the delay in getting Salvani to the hospital was for a medical reason. Dr. Caraballo's testimony shows that he insisted on evaluating Salvani before sending him to the hospital "because it was protocol." (ECF No. 131-3 at 42.) In his deposition, he said that he would have made a decision over the phone to send a person to the hospital without seeing them if the patient is "crashing" and has "no vital signs." (ECF No. 131-3 at 45.) He says that he brought Salvani to the main unit for assessment and evaluation rather than taken to the hospital because "he had vital signs. He was alive." (*Id.* at 45.) Considering the nature of the medical need and the reasons for the delay, a jury could decide that Dr. Caraballo was deliberately indifferent to Salvani's urgent medical needs. *See Davies v. Israel*, 342 F. Supp. 3d 1302, 1308 (S.D. Fla. 2018) (Moore, J.) (tending to plaintiff while he was unconscious rather facilitating plaintiff's "immediate emergency transfer to a hospital by, for example, calling 911" may constitute deliberate indifference).

### D. Wexford and Corizon (the "corporate defendants")

The corporate defendants argue that Salvani fails to adequately identify any policy or practice that caused his injuries. Salvani counters that Wexford and Corizon have policies of prioritizing costs over medical. The Court agrees with

the corporate defendants that the undisputed facts support summary judgment, and thus it **grants** the Wexford's motion for summary judgment (**ECF No. 116**) and **grants** Corizon, Dr. Caraballo, and Loznicka's motion **as to Corizon only** (**ECF No. 111**).

Private companies like the Corporate Defendants, while not government entities, may be liable under section 1983 in the performance of "a function which is traditionally the exclusive prerogative of the state." *Kimbrough v. Corizon Health, Inc.*, No. 4:17cv249, 2018 WL 3672761, at *6 (N.D. Fla. June 29, 2018) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 703 (11th Cir. 1985)). Yet, respondent superior or vicarious liability is not a basis for recovery on such claims, and a plaintiff must prove a "policy or custom" led to the violation of his or her constitutional right. *Id.*; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). So where, as here, a prison inmate brings claims against prison officials for deliberate indifference to the need for medical care, that plaintiff must plausibly allege: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Fisher v. Miami-Dade Cty.*, 114 F. Supp. 3d 1247, 1252 (S.D. Fla. 2015) (Huck, J.) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

Salvani argues that the corporate defendants have policies of prioritizing costs over medical need when determining if, and what kind, of medical care would be provided, and thus they should be held liable for his injuries. As evidence, he cites to the deposition testimony from a different litigation of Dr. Carl Maier, the medical director of the hospital at the Reception and Medical Center from 2014-2015. (ECF No. 139 at 10.) He testified that prisoners were not treated for hepatitis C and hernias because of the cost. (ECF No. 136-21.) He also stated that Wexford and Corizon were "regularly and repeatedly failing to meet the majority of those criteria which we had agreed." *Id.*

This evidence is insufficient to defeat summary judgment. First, Salvani has not provided sufficient evidence to show that the corporate defendants have a policy and practice of prioritizing cutting costs over delivering quality medical treatment. "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004). Although Dr. Maier's testimony regarding Hepatitis C and hernia surgeries is alarming, it does not establish that the corporate defendants had a "wide-spread" or "persistent" practice of prioritizing cutting costs over administering treatments. It is only one doctor's testimony regarding two treatments, and neither treatment is at issue in this case.

Second, even assuming that Salvani could establish that the corporate defendants have adopted this practice, there is no record evidence that it caused Salvani's sepsis. In order to be held liable, the corporate defendants' policies must be "the moving force" behind Salvani's injury. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004). There is no evidence that employees were instructed not to administer antibiotics or call an ambulance because they are too costly. The only evidence that this policy caused Salvani's injuries is the common-sense inference that a medical provider spending more money may likely lead to the availability of higher quality medical treatment for all prisoners, including Salvani. That his injury may have been less likely if the corporate defendants adopted a different policy is insufficient to show causation. *See McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004) ("While it may be true that the Board's budget decision would make a violation of his constitutional rights more likely, that alone cannot give rise to an inference that a policy maker's failure to scrutinize the budget produced a specific constitutional allegation.").

### 4. Conclusion

In sum, after reviewing the parties' written submissions and exhibits, and the applicable law, the Court **grants in part and denies in part** Dr. Caraballo, Loznicka, and Corizon's motion for summary judgment (ECF No. 111). Summary judgment is **granted** as to Corizon, and **denied** as to Dr. Caraballo and Loznicka.

Dr. Castillo's motion for summary judgment (**ECF No. 117**) is **granted** in its entirety.

Wexford's motion for summary judgment (**ECF No. 116**) is also **granted** in its entirety.

**Done and ordered** in chambers in Miami, Florida, on September 16, 2019.

Robert N. Scola, Jr.
United States District Judge