United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Craig Salvani, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 17-24567-Civ-Scola |
| Corizon Health, Inc., and others, | ) |
| Defendants. | ) |
| | ) |

**Order on Dr. Castillo's Motion for Summary Judgment**

This action is before the Court following remand from the Eleventh Circuit Court of Appeals. The appellate court reversed this Court's order granting summary judgment in favor of Dr. Marta Castillo (ECF No. 188) and remanded for further proceedings. While the appellate court held that there are genuine disputes of material facts as to whether Salvani suffered from a serious medical need while he was under Dr. Castillo's care, the appellate court remanded to this Court to determine on summary judgment whether Dr. Castillo's actions constituted deliberate indifference. (ECF No. 188.) After consideration of the parties' briefs, the record, and the relevant legal authorities, the Court **grants** Dr. Castillo's motion for summary judgment. (**ECF No. 117**.)

1. **Background**

The parties are familiar with the facts. The Court will briefly restate the facts relevant to Dr. Castillo's treatment of Salvani.

On February 6, 2014, the South Florida Reception Center (the "Center"), where Wexford Health Services, Inc. provided medical services to inmates, received Salvani. (ECF No. 91 at ¶¶ 1, 3; ECF No. 137 at ¶¶ 1, 3.) Dr. Marta Castillo was employed by Wexford at this time and provided medical care to inmates at the Center. (ECF No. 91 at ¶ 2; ECF No. 137 at ¶ 2.) Upon Salvani's arrival, an initial health screening was performed, during which Salvani reported neck and back pain from a recent fight. (ECF No. 91 at ¶¶ 6–7; ECF No. 137 at ¶¶ 6–7.) There were no reports of coughing, chest pain, shortness of breath, night sweats, fevers, or weigh loss. (ECF No. 91 at ¶ 8; ECF No. 137 at ¶ 8.) That same day, blood and urine specimen were collected; the results later showed that Salvani had a small amount of blood in his urine and an elevated white blood cell count. (ECF No. 91 at ¶¶ 9–11; ECF No. 137 at ¶¶ 9–11.)

Two days later, a nurse again evaluated Salvani under a back pain protocol—Salvani complained of back and neck pain, but the nurse's evaluation did not show that immediate referral to a medical provider was necessary. (ECF No. 91 at ¶ 12; ECF No. 137 at ¶ 12.) Salvani denied at this time that he had any pain with urination and did not report any upper respiratory symptoms or complaints. (*Id.*) Salvani was given ibuprofen for his back and neck pain. (*Id.*)

Four days later, another nurse evaluated Salvani; this evaluation showed normal vital signs, including no fever. (ECF No. 91 at ¶¶ 13–14; ECF No. 137 at ¶¶ 13–14.) The nurse reviewed the results of Salvani's February 6, 2014 blood and urine tests and ordered additional ibuprofen, a flu vaccine, a cervical spine x-ray, a repeat urine test in one week, a repeat blood test in four weeks, and a low bunk-bed pass. (ECF No. 91 at ¶¶ 16–17; ECF No. 137 at ¶¶ 16–17). Salvani refused rectal and genito-urinary exams. (ECF No. 91 at ¶ 15; ECF No. 137 at ¶ 15.)

The next day, February 13, 2014, a radiologist reviewed Salvani's cervical spine x-ray and noted that a nodule "could represent a developing granuloma" and recommended a follow-up. (ECF No. 91 at ¶ 19; ECF No. 137 at ¶ 19.) Another doctor reviewed the x-ray five days later and noted that the x-ray required no further follow-up. (ECF No. 91 at ¶ 29; ECF No. 137 at ¶ 29.)

On February 17, 2014, another nurse evaluated Salvani under the cold/upper respiratory infection/influenza symptoms protocol and recorded that while Salvani complained of coughs and other symptoms, his vitals were normal except for an elevated pulse. (ECF No. 91 at ¶¶ 20–21; ECF No. 137 at ¶¶ 20–21.) Salvani was given ibuprofen and cough syrup and was instructed to return if his symptoms worsened. (ECF No. 91 at ¶¶ 24–25; ECF No. 137 at ¶¶ 24–25.)

That same day, Dr. Castillo was notified of Salvani's condition. (ECF No. 91 at ¶ 23; ECF No. 137 at ¶ 23.) She ordered a repeat urinalysis and an electrocardiogram. (ECF No. 91 at ¶ 27; ECF No. 137 at ¶ 27.) The urinalysis showed a high white blood cell count, and the electrocardiogram was abnormal for a rapid heartrate. (ECF No. 91 at ¶¶ 10, 28; ECF No. 137 at ¶¶ 10, 28.) Dr. Castillo states that she never saw Salvani and did not review his x-ray, which was reviewed by a radiologist and another doctor, the last of whom noted that the x-ray was normal. (ECF No. 91 at ¶¶ 19, 29–31; ECF No. 137 at ¶¶ 19, 29–31.)

Salvani left the Center on February 20, 2014, and, four days later, Salvani went into septic shock, resulting in the amputation of both legs below the knees. (ECF No. 91 at ¶¶ 32, 34; ECF No. 137 at ¶¶ 32, 34.)

### 2. Legal Standard

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *See id.*; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

### 3. Analysis

The Eighth Amendment prohibits the "deliberate indifference to serious medical needs of prisoners." *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To show that the denial of medical care violated the Eighth Amendment, a plaintiff must meet four requirements: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).

As the Eleventh Circuit held, there is a genuine issue of material fact regarding whether Salvani had a serious medical need, as a reasonable juror could conclude that Salvani's "septic shock and ultimate amputation was the result of delay in diagnosis and treatment caused by Castillo's inaction." (ECF No. 188 at 7.) The Eleventh Circuit left the determination of whether Dr. Castillo acted with deliberate indifference to the district court on remand. (*Id.*

at 8.) Deliberate indifference is shown by "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). The Court will address each prong below.

### A. Subjective knowledge of a risk of serious harm and disregard of that risk

As an initial matter, the Court holds that there is a genuine dispute of material fact concerning whether Dr. Castillo had subjective knowledge of Salvani's serious medical need. *See Bingham*, 654 F.3d at 1176. Dr. Castillo had general knowledge of Salvani's condition, as she reviewed Salvani's records, received updates concerning his status, and ordered treatment and testing. (ECF No. 91 at ¶¶ 23, 27; ECF No. 90-1 at 10–11, 33.) However, as the Eleventh Circuit held, there is a genuine dispute of material fact as to whether Salvani's condition constituted a serious medical need. (*See* ECF No. 188 at 7.)

Furthermore, the Court holds that there is a genuine dispute of material fact as to whether Dr. Castillo disregarded that risk of serious harm under the second prong of the *Bingham* test. As the Eleventh Circuit held, there are genuine disputes of material fact concerning whether Salvani's septic shock and amputation were caused by Dr. Castillo's "inaction." (*Id.*) Therefore, there are also genuine disputes of material facts as to whether Dr. Castillo disregarded any potential serious medical need.

### B. Conduct more than negligence

The Court will focus on the dispositive question of whether Dr. Castillo committed conduct worse than mere negligence. *See Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.") (citing *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")).

This can be a gauzy standard. *See Howell v. Evans*, 922 F.2d 712, 720 (11th Cir. 1991) (noting the "hazy distinction between negligence and deliberate indifference"). However, courts have fleshed out the parameters of a deliberate indifference claim. For example, it is well established that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" does not rise to a violation of the Eighth Amendment. *See Harris*, 941 F.2d at 1505. That is because the Constitution does not forbid unfortunate medical outcomes that were only the

result of a "medical judgment call, an accident, or an inadvertent failure." *Rogers v. Evans*, 792 F.2d 1052, 1060 (11th Cir. 1986); *see also Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (holding that a plaintiff must show more than "mere[] accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law"). The Constitution only forbids "shocking" and "gross violation[s] of accepted practice." *Howell*, 922 F.2d at 721 n.9; *see also Hernandez v. Sec'y Fla. Dept. of Corr.*, 611 F. App'x 582, 584 (11th Cir. 2015) ("Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."). This can include a gross delay in providing necessary treatment if the delay is for non-medical reasons. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Moreover, this standard can be met by "a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Furthermore, "when the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Id.* at 1255.

No matter the wording, the precedent above is clear—the Constitution forbids the following types of medical treatment: (1) the outright and unjustified denial of medical care (whether a complete denial or a denial in effect) and (2) the administration of grossly inadequate and shocking care (including a delay in providing necessary care) in knowing disregard of the patient's condition.

### 1. *Denial of medical care*

This is not a case where Salvani was outright denied medical care. *See Ross v. Corizon Med. Servs.*, 700 F. App'x 914, 917 (11th Cir. 2017) (affirming grant of summary judgment where there was no evidence of a denial of treatment or medication). Rather, Salvani was evaluated four times in two weeks, consistently displayed normal vital signs except for a heightened pulse and an elevated white blood cell count, and received two urinalyses, one blood test, an x-ray, and medication for back and neck pain.[1] (ECF No. 91 at ¶¶ 6–8, 12–17, 19–21, 27–28; ECF No. 137 at ¶¶ 6–8, 12–17, 19–21, 27–28.) Additional

---

[1] It is of no moment that Dr. Castillo did not personally administer every instance of care. Rather, the deliberate indifference standard concerns itself with the level of care administered to the plaintiff by each defendant in context, not just the isolated actions or inactions of every doctor involved in a prisoner's care. *See generally Harris v. Prison Health Servs.*, 706 F. App'x 945, 953 (11th Cir. 2017) (evaluating a defendant's liability in context with the care administered by other medical professionals).

future blood and urine tests were also ordered. (ECF No. 91 at ¶¶ 13–17, 27–28; ECF No. 137 at ¶¶ 13–17, 27–28.)

Moreover, this is not a case where the treatment provided amounted to "no treatment at all." *McElligott*, 182 F.3d at 1255. Rather, Salvani received some treatment for the symptoms of which he complained, multiple evaluations, and diagnostic testing. *See Monteleone v. Corizon*, 686 F. App'x 655, 659 (11th Cir. 2017) (holding that the plaintiff received more than cursory treatment as he "received medical attention each time he submitted sick calls and he later received an alternative medication"). Therefore, Dr. Castillo cannot be found liable on this ground.

### *2. Grossly inadequate and shocking care*

Salvani argues that "diagnosis and treatment were needed," yet Dr. Castillo "did nothing." (*See* ECF No. 132 at 11.) However, as discussed above, Salvani received some treatment—the question is whether that treatment and any delay in providing additional treatment or diagnoses were constitutionally adequate.

As the case law demonstrates, this is a high bar. *See Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) ("It is also true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."). Therefore, in cases where a prisoner received some treatment, as here, courts look to "the reason for the delay [in receiving additional medical care] and the nature of the medical need[.]" *McElligott*, 182 F.3d at 1255. However, the failure to diagnose an illness, alone, cannot rise to deliberate indifference. *See Estrada v. Stewart*, 703 F. App'x 755, 759 (11th Cir. 2017) ("[T]he failure to diagnose could not sustain the plaintiff's Eighth Amendment claim.") (citing *McElligott*, 182 F.3d at 1256); *see also Callahan v. Correct Health Care*, No. 17-cv-81053, 2018 WL 4932874, at *2 (S.D. Fla. May 8, 2018) (Bloom, J.) ("Plaintiff's failure to diagnosis theory, however, is insufficient to state a claim for deliberate indifference under the Eighth Amendment.") (citing *Estrada*, 703 F. App'x at 759).

The Court holds that Dr. Castillo's actions and inactions do not rise above mere negligence or medical malpractice so as to constitute grossly inadequate and shocking care. The care that Salvani received, and any delay in diagnosis and additional treatment, does not rise to deliberate indifference. As laid out below, Dr. Castillo and medical personnel administered care and took some action in response to Salvani's complaints and test results.

- On February 6, 2014, Salvani reported no symptoms other than back and neck pain (ECF No. 91 at ¶¶ 7–8; ECF No. 137 at ¶¶ 7–8.)
    - In response, medical personnel took urine and blood samples for testing and saw Salvani again two days later to evaluate his reported back pain. (ECF No. 91 at ¶¶ 6, 12; ECF No. 137 at ¶¶ 6, 12.)
- On February 8, 2014, Salvani was again evaluated and reported no symptoms other than back pain, and he showed largely normal vital signs, with a low fever of 100.0. (ECF No. 91 at ¶ 12; ECF No. 137 at ¶ 12.)
    - In response, medical personnel gave Salvani ibuprofen for his reported pain. (*Id.*)
- On February 12, 2014, four days after the urine and blood sample results were reported and four days after the last evaluation, medical personnel evaluated Salvani and reviewed the results of his lab tests. (ECF No. 91 at ¶¶ 13, 16; ECF No. 137 at ¶¶ 13, 16.) Salvani again reported no new medical symptoms and showed largely normal vital signs. (ECF No. 91 at ¶¶ 13–14; ECF No. 137 at ¶¶ 13–14.)
    - In response to this evaluation, medical personnel gave Salvani more ibuprofen, a flu vaccine, and a cervical spine x-ray and ordered repeat urine and blood tests because of his elevated white blood cell counts and other slight abnormalities. (ECF No. 91 at ¶¶ 16–17; ECF No. 137 at ¶¶ 16–17.)
    - Salvani was offered a digital rectal exam and genito-urinary exam, but he refused these tests. (ECF No. 91 at ¶ 15; ECF No. 137 at ¶ 15.)
    - Moreover, one day later, a radiologist reviewed the x-ray, noted the possibility of a "developing granuloma," and recommended following up. (ECF No. 91 at ¶ 19; ECF No. 137 at ¶ 19.)
- On February 17, 2014, five days after his last evaluation, Salvani reported to medical personnel that he had developed new symptoms, and medical personnel evaluated him and determined that his vital signs were largely normal, although Salvani had a runny nose, a heightened pulse, and an elevated white blood cell count. (ECF No. 91 at ¶¶ 20–21, 23; ECF No. 137 at ¶¶ 20–21, 23.)

- - o In response, medical personnel gave Salvani ibuprofen and cough syrup, instructed him to return if his symptoms worsened, told him to increase his fluid intake, and ordered a repeat urinalysis and an electrocardiogram. (ECF No. 91 at ¶¶ 24–27; ECF No. 137 at ¶¶ 24–27.)
  - On February 18, 2014, another doctor reviewed Salvani's earlier cervical spine x-ray and noted that it was normal. (ECF No. 91 at ¶ 29; ECF No. 137 at ¶ 29.)
  - On February 19, 2014, two days after ordering the repeat urinalysis, Dr. Castillo reviewed the results and noted that the results were abnormal. (ECF No. 90-1 at 33.)
    - o In response, Dr. Castillo requested to "pull chart." (*Id.*)
  - One day later, on February 20, 2014, Salvani was transferred out of the Center and was no longer in the Center's physical care. (ECF No. 91 at ¶ 5; ECF No. 137 at ¶ 5.) There is no indication that Dr. Castillo gave any explicit instructions or notes to the medical team at the Reception Medical Center where Salvani was transferred.

The undisputed facts show that from February 6, 2014 to February 17, 2014, Salvani did not report any symptoms other than neck and back pain, for which he was evaluated and treated. During that time, Salvani had largely normal vital signs, although he had a heightened pulse and elevated white blood cell counts. After February 17, 2014, at which time Salvani reported new symptoms, additional tests were conducted. The only delays in providing treatment in response to a known condition consisted of a four-day delay to review the initial urinalysis, a five-day delay for another doctor to follow up on the x-ray, and a one-day delay to review the second urinalysis. But Dr. Castillo's and the medical staff's failure to diagnose Salvani's infection alone cannot constitute deliberate indifference. *See Estrada*, 703 F. App'x at 759.

At most, there is a difference in medical opinion concerning whether Dr. Castillo should have taken immediate action and ordered additional diagnostic tests in response to Salvani's elevated white blood cell counts and heightened pulse, as well as his cold-like symptoms that developed around February 17, 2014. Such a difference in opinion demonstrates that Dr. Castillo's actions did not rise above mere negligence or medical malpractice. *See Rogers*, 792 F.2d at 1060 (holding that "medical judgment call[s]" do not constitute deliberate indifference); *Harris*, 706 F. App'x at 952 (holding that a four-day delay of an x-ray which later returned as normal did not constitute deliberate indifference, but rather that "[w]hether prison system medical staff should have employed 'additional diagnostic techniques or forms of treatment' is a 'classic example of

a matter of medical judgment,' and therefore, '[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.'") (quoting *Estelle*, 429 U.S. at 107); *Boone v. Gaxiola*, 665 F. App'x 772, 775 (11th Cir. 2016) (affirming a grant of summary judgment where the plaintiff "did not have the typical symptoms" of appendicitis and did not have other indicators showing a risk of appendicitis). Salvani has pointed to no "shocking" or "gross violation" of care by Dr. Castillo in response to his symptoms demonstrating that the "need for treatment [was] obvious." *See Hernandez*, 611 F. App'x at 584; *McElligott*, 182 F.3d at 1255.

At bottom, Dr. Castillo could, and perhaps should, have done more in response to Salvani's condition, particularly as additional symptoms developed on February 17, 2014. However, she and other medical personnel acted and administered some care before Salvani left the Center. Their failure to diagnose and fulsomely treat Salvani's infection had disastrous results, but the undisputed evidence shows that Dr. Castillo's actions did not rise above mere negligence or medical malpractice.

### 4. Conclusion

After reviewing the parties' briefs, the record, and the applicable law, the Court **grants** Dr. Castillo's motion for summary judgment (**ECF No. 117**) and enters summary judgment for Dr. Castillo. All other pending motions are **denied as moot**. The **Clerk** is directed to **close** this case.

**Done and ordered** in chambers in Miami, Florida, on October 18, 2021.

Robert N. Scola, Jr.
United States District Judge